**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

09 JUL -7  AM 10: 29

CLERK - LAS CRUCES

MARK J. WILSON,

   Plaintiff and Counter-Defendant,

v.              CV 07-457 WPL/LAM

JOHN BRENNAN, MICHELLE GEELS,
TOUR OF THE GILA INC., DOYNE
WREALLI and ROB NARVAEZ,

   Defendants and Counter-Plaintiffs.

**ORDER**

  The Tour of the Gila is a United States Cycling Federation (USCF) sanctioned bicycle race

held in Grant County, New Mexico.  The Tour draws 400 to 500 USCF racers each year, and was

described by Velo News as "not the richest or the most prestigious race in America, but it has to be

the hippest."

  Mark Wilson, a Race Director of the Tour for twelve years, has sued Tour of the Gila, Inc.,

a non-profit corporation that conducts the Tour, and Jack Brennan, Michelle Geels, Doyne Wrealli

and Rob Narvaez, individuals associated with the Tour in various capacities, for copyright

infringement. Wilson claims that he created original text, compilations of facts and graphics for the

Tour's Race Bible and other documents and that the Defendants have infringed on his copyrighted

materials by using them without his permission. The Defendants assert that the Tour purchased

Wilson's intellectual property or obtained a license to use Wilson's materials in May of 2002, and

have filed counterclaims against Wilson, seeking a declaratory judgment that Wilson's copyrights

are invalid, and seeking recovery for conversion, fraud, and violations of the New Mexico Unfair

Practices Act. This Order will resolve all issues presented in this case.

1

## BACKGROUND

In the fall of 1986 a small group of bicyclists in Silver City, New Mexico, who were interested in promoting the Silver City/Grant County area, met to consider hosting a bicycle race for USCF riders in Grant County in 1987. The group consisted of Mark Richard, Mark Wilson, Tim Matthes, Mike Sauber and Sharlene Grunerud. Wilson, an experienced bicycle racer, told the group that he would work with them on developing the race, but only if he was paid to do so.

Once Scott Nichols Motors agreed to be the title sponsor for the race, work to plan the race began in earnest. Many decisions had to be made, including how many days of racing, what type of bicycle race to hold, what routes the races would take, what the name of the race would be, and how to recruit volunteers to assist with the race and provide lodging for the riders. Wilson served as Race Director for the 1987 race, a four-day stage race which was called the "Tour of the Gila," and he was paid $1,000 for his services.

The 1987 race was a success, and the group decided to make the race an annual event. Wilson served as Race Director each year from 1988 to 1994 and was paid each year for his services. During this time the race was expanded to five days to include a time trial, three road races, and a criterium. Wilson and others also created and updated yearly a Tour of the Gila Race Bible, Course Itineraries & Time Schedules, and a document variously referred to as the Race Announcement or the Official Race Guide and Entry Form ("Race Announcement"). The Race Bible is a lengthy compilation of materials (12 pages long in 1994, but 28 pages long by 1999), which includes the race schedule, the rules governing the race, the prize distribution, a list of past winners, and maps, profiles and narrative descriptions of the race courses. The Course Itineraries & Time Schedules include information for each day's race about landmarks on the race course and a prediction of the length of time to complete the race based on historical finishing times. This

document was designed to be distributed to volunteers who were assisting with the race. The Race

Announcement contains a brief description of the Tour, including a Prize List, Course Descriptions

for each race, and information about how to register for the race.[1] The Race Announcement was

distributed to prospective bicycle racers, while the Race Bible was distributed to the racers and race

officials each year.

After the 1994 race Wilson moved to Savannah, Georgia and Liz Blancett served as Race

Director for the 1995, 1996 and 1997 races. In 1995 the Race Bible was substantially revised. Steve

Farris rewrote the text for the 1995 Race Bible and updated it yearly for the races held in 1996,

1997, 1998 and 1999. Wilson moved back to Silver City in 1997. He served as Race Director for

the 1998 and 1999 races, and was paid $2,500 each year for his services.

Like many volunteer groups, the Tour was run on a very informal basis from its inception

in 1986 until early 2000. In January of 2000 the organizational meeting of the Board of Directors

of the Tour of the Gila, Inc. was held. At this meeting, Michelle Geels, a long-time volunteer, was

elected as President, while Wilson was elected Vice-President and Jack Brennan was elected

Secretary/Treasurer.[2]

Although Wilson moved to Maryland in August of 1999, he served as Race Director with

Brennan for the 2000 and 2001 races. Wilson also assembled the 2000 and 2001 Race Bibles from

materials provided by various people. He admitted that they were substantively very similar to the

---

[1] It is somewhat unclear exactly what part of the Race Announcement Wilson claims is protected by copyright. His registration with the Copyright Office refers to "[m]arketing information directed to prospective licensed racers," and the last two pages contain Registration Locations and Race Schedule & Start Locations for the individual stages. (Ex. 164.) Because this material is also found in the Race Bible, I will not separately discuss the material found in the Race Announcement.

[2] The Internal Revenue Service granted non-profit status to the Tour of the Gila, Inc. on August 10, 2007.

1999 Race Bible. On the last page of the 2000 Race Bible Wilson placed the following notice: "Copyright © 2000 by Tour of the Gila[,] Inc. All rights reserved." He placed a similar notice on the last page of the 2001 Race Bible. Wilson also prepared the Course Itineraries & Time Schedules and Race Announcement. He was paid $2,000 plus costs each year for his services.

Brennan and Wilson did not work well together, and it was difficult for Wilson to be actively involved in the day-to-day planning of the race because he was living over 2000 miles away. Brennan decided not to ask Wilson to serve as Race Director for the 2002 race, and asked Michelle Geels to serve as Race Director with him. Brennan did ask Wilson to serve as Race Consultant that year and to prepare the 2002 Race Bible, but they did not discuss specific details about the work to be done or whether Wilson would be paid to do it.

The 2002 Race Bible prepared by Wilson relied heavily upon the earlier race bibles but also included new material that Wilson created.[3] Wilson added some new text passages to the 2002 Race Bible, together with factual compilations, maps and profiles of the race courses, and page headers for the races. On the last page of the 2002 Race Bible Wilson placed the following notice: "Copyright © 2002 by Mark Wilson[.] All rights reserved[.]"

The 2002 Tour was held on May 1 to 5, 2002. On May 8, 2002 Wilson presented Brennan with a bill for $1,268.66 for preparation of the 2002 Race Bible. Wilson's meeting with Brennan in Brennan's store, Gila Hike and Bike, about payment of the bill was short and tense. Brennan was upset because he did not anticipate that Wilson would charge the Tour for preparing the 2002 Race

---

[3] Wilson admitted that most of the text in the 2002 Race Bible is identical or substantially similar to the text written by Steve Farris for the 1999 Race Bible. Compare the sections in the 1999 and 2002 Race Bibles titled Rider Conduct, Special Tour of the Gila Rules, Race Support, Support Crews and Feed Zones, Emergency Information, and, for the Silver City-Mogollon, Fort Bayard Inner Loop and Gila Monster Road Races, the Brief Course Description, Directions for Racer's Support Crews and Finish Procedure.

Bible. Wilson and Brennan have differing recollections of this conversation. Brennan testified that he told Wilson that the Tour was purchasing Wilson's intellectual property when he paid Wilson's bill. In contrast, Wilson maintains that he told Brennan that his intellectual property was not for sale.

Relations between Wilson and Brennan and others associated with the Tour deteriorated after this meeting. On May 29, 2002 Wilson wrote to Brennan and for the first time formally asserted that he had copyright protection for the graphics used in the 2002 Race Bible. He gave the Tour permission to use the graphics for the 2003 race, but demanded payment for any use of the graphics after that time.

Doyne Wrealli produced the Tour's Race Bibles for the 2003 through 2006 races. Rob Narvaez maintained the Tour's website and posted the Race Bible and other materials on the Internet beginning in 2004. Wrealli and Narvaez worked under directions given to them by Brennan and Geels, who have served as a Race Directors for the Tour since 2002.

In the spring of 2004 Wilson viewed the Tour's Race Bible and other materials on-line and decided that they infringed on his intellectual property rights. Wilson contacted the Tour and offered to allow the Tour to use the graphics for the 2004 race for the sum of $329. The Tour declined to make payment, but promised not to make further use of Wilson's materials. In 2004 Steve Farris drove the race courses with a GPS unit to get more accurate profiles of the roads, and then used a computer program to design new race course profiles for the Race Bible.

On June 21, 2004 Wilson wrote to Brennan and claimed copyright protection in virtually all aspects of the Tour. After receiving this letter the Tour made efforts to comply with Wilson's demands that it stop using his works by making minor changes to Wilson's maps and the normal yearly revisions to the Race Bible.

In the spring of 2005 Wilson again viewed the Tour's Race Bible and other materials on-line

5

and concluded that they infringed on his intellectual property rights. On April 25, 2005 Wilson registered with the Copyright Office the text, factual compilations and the graphic materials that he claims to have created in connection with the Tour.[4] Wilson's Applications did not reflect that he had incorporated any preexisting works into his text or graphic materials.

In April of 2006 Wilson notified the Tour of his copyright registrations and demanded that the Tour stop infringing on his copyrights. The parties had various discussions about how to resolve this matter, but were unable to do so. On May 9, 2007 Wilson filed suit claiming copyright infringement.

### DISCUSSION

The Copyright Act of 1976 protects "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). The essential element to qualify for copyright protection is that the work must be original to the author. *Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). As the term is used in copyright law, original "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id*. The creativity required is "extremely low" and the work need not be novel; the vast majority of works will satisfy this requirement quite easily because they possess some slight creative spark. *Id*.

Three types of works are entitled to copyright protection—creative works, derivative works and compilations—and the Copyright Act has created a hierarchy in terms of the protection afforded to each one. *Warren Publ'g, Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1515 n.16 (11th Cir. 1997). An example of a creative work is a biography and it is entitled to the most protection under

---

[4] Wilson registered portions of the Race Bible for the 2002 race and the Course Itineraries & Time Schedules for the 2000 race. He never explained why he registered materials from different races.

the copyright laws. *Id.*; *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 943-44 (10th Cir. 2002). A derivative work "is a work based on one or more preexisting works" that have been "recast, transformed, or adapted" into an original work. 17 U.S.C. § 101. An example of a derivative work is a screenplay based on a novel and it is entitled to the next level of protection. *Warren*, 115 F.3d at 1515 n.16. A compilation is "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. Because facts are not copyrightable, the Supreme Court has recognized that the copyright in a factual compilation is "thin" and factual compilations are entitled to the least amount of protection under the copyright laws. *Feist*, 499 U.S. at 349.

### Wilson's Claims for Copyright Infringement

Wilson claims that he has a valid copyright in the name of the race and the design and selection of the race courses. He also claims copyright protection for the text, factual compilations and graphics that he created for the 2002 Race Bible and for the Course Itineraries & Time Schedules. Wilson claims that he donated the use of his intellectual property to the Tour before 2002, and that the payment he received was for his duties as Race Director and not for preparing the race bibles or related documents. To establish that the Defendants infringed on his copyrights, Wilson must prove two elements: (1) that he owns valid copyrights, and (2) that the Defendants copied constituent elements of his work that are original. *Id.* at 361.

1. Ownership of Valid Copyrights

The Defendants contend that Wilson committed fraud on the Copyright Office by intentionally concealing that his works are derived from preexisting works by others. (Doc. 144 at 7.) They claim that Wilson's failure to disclose this information renders his copyrights invalid and

7

makes them incapable of supporting this infringement action.

A certificate of registration is admissible in an infringement action as "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). A party seeking to establish an allegation of fraud on the Copyright Office, which would rebut the presumption of copyright validity, bears a heavy burden. *Lennon v. Seaman*, 84 F. Supp. 2d 522, 525 (S.D.N.Y. 2000). A misstatement of an immaterial fact or a clerical error in an application for registration will not invalidate the copyright. *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1161 (1st Cir. 1994); MELVILLE B. NIMMER & DAVID NIMMER, 4 *Nimmer on Copyright* § 7.20[B] (2008). However, if a party knowingly and intentionally fails to advise the Copyright Office of facts that might have led to rejection of a registration application, the court may hold that the registration is not valid. *Masquerade Novelty, Inc. v. Unique Indus., Inc.*, 912 F.2d 663, 667 (3rd Cir. 1990); *Nimmer on Copyright*, § 7.20[B].

Failing to disclose material information deprives the Copyright Office of the ability to make a fully informed decision about whether the work is sufficiently original to deserve copyright protection. Wilson initially claimed in his applications for registration that they contained only his own original material. In 2008 Wilson amended his copyright applications to reflect that his text is derivative of prior works and that his graphic materials relied upon preexisting government documents, and the Copyright Office accepted his amended registrations. (*See* Exs. 163, 165 and 224.) Given Wilson's pro se status and the voluntary amendment to his applications, I conclude that Wilson did not intentionally fail to advise the Copyright Office that his works were derivative of prior works, but he inadvertently did not provide information that might have been material. *See Express, L.L.C. v. Fetish Group, Inc.*, 424 F. Supp. 2d 1211, 1223-24 (C.D. Cal. 2006) (considering the party's voluntary amendment of the registration and the Copyright Office's acceptance of the

8

amendment in determining that an omission on an application for registration was not intentional).

The law on material, inadvertent omissions from a registration application is less well settled. Both the First and Third Circuits have suggested, in dicta, that the correct approach in this situation is to deprive the party of the presumption of validity that ordinarily attaches to a registered copyright under § 410(c) and to require that party to establish that the works are entitled to copyright protection. *Data Gen.*, 36 F.3d at 1163; *Masquerade Novelty*, 912 F.2d at 668 n.5. I will follow the approach suggested by the First and Third Circuits and will require Wilson to prove that his works are entitled to copyright protection.

2. Does Wilson's Work Qualify for Copyright Protection?

*The Name of the Race and Design of the Race Courses*

There are both factual and legal reasons for concluding that Wilson cannot claim that he has a valid copyright in the name "Tour of the Gila" and in the design of the race courses. First, the parties presented conflicting evidence about who named the race and who was responsible for the design and selection of the Tour's race courses (*i.e.*, roads selected, direction of travel, and start/stop locations). Grant County is a rural area and, as Tim Matthes noted, there are not many roads to choose from if you want to design a multi-stage bicycle race. While Wilson was the Race Director for the Tour and made many decisions about the race himself, I find that the decisions on the name of the race and the selection of the race courses were made by the group that initially organized and produced the race.[5]

_____

[5] In his June 21, 2004 letter, Wilson asserts that the Tour "legally own[s] practically nothing of the Tour of the Gila bicycle race," and claims he has copyright protection in "(1) the words of the race bible, (2) the words of the entry form descriptions, (3) the graphics of the race courses, (4) the graphics of location maps, (5) charts and tables of the race bible, (6) course itinerary and schedule papers, [and] (7) race course profiles and climbs' ratings values." (Ex. 86 at 1, 2.) Given this exhaustive list of claimed copyrighted materials, it is significant that Wilson did not specifically claim that he named the race or that he selected and

Second, as a matter of law, Wilson cannot claim copyright in these matters. A party cannot claim copyright protection in the title of the party's work. Regulations published by the Copyright Office provide that "[w]ords and short phrases such as names, titles, and slogans" cannot be protected by copyright law. 37 C.F.R. § 202.1(a); *Shaw v. Lindheim*, 919 F.2d 1353, 1362 (9th Cir. 1990) ("[T]itles, in and of themselves, cannot claim statutory copyright."). Further, Wilson cannot claim copyright in the design and selection of the race courses. Copyright protection does not extend to protect ideas, only the particular expression of ideas. 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work . . . extend to any idea, . . . concept, principle, or discovery, regardless of the form in which it is described . . . .") Most courts that have considered the question have held that sporting events are not copyrightable. *Hoopla Sports & Entm't v. Nike, Inc.*, 947 F. Supp. 347, 354 (N.D. Ill. 1996) (citing cases). Thus, Wilson does not have a valid copyright in either the name of the race or the design and selection of the race courses.

*The Text and Factual Compilations*

The 2002 Race Bible and the 2000 Course Itineraries & Time Schedules are derivative works because they are based on prior race bibles and course itineraries and time schedules that Wilson revised and adapted. 17 U.S.C. § 101. The copyright in a derivative work extends only to the material contributed by the author of that work and does not extend to the preexisting material employed in the work. 17 U.S.C. § 103(b); *Darden v. Peters*, 488 F.3d 277, 286 (4th Cir. 2007). Wilson claims copyright protection in the original text passages and the compilations of facts that he added to the 2002 Race Bible and the 2000 Course Itineraries & Time Schedules. (Doc. 145 at 4.)

---

designed the race courses.

By comparing the 2002 Race Bible to the 1999 Race Bible it is possible to identify the new text and compilations of data that Wilson interspersed throughout the Bible.[6] While the line is sometimes difficult to draw, I believe that the following paragraphs in the 2002 Race Bible should be considered new text for copyright purposes: Prize Classifications (seven paragraphs on page 4), Race Support (four paragraphs on pages 5-6), and for each individual stage race, the paragraphs titled Start Location, Directions from Silver City Chamber of Commerce, Parking, and Restrooms and Water. The following paragraphs describing different individual races are also new text: Race Number Attachment (page 10), Posting Results (pages 13, 18, 20), Time Cuts (pages 13, 18, 20), Technical Support (page 21), Protest (page 25) and Awards (page 25). Finally, Wilson added the last sentence to the Special Note found on page 14, which would also constitute new text material.

The following material are new compilations of facts for the 2002 Race Bible: Races Offered (page 2), Registration Locations (page 2), Race Schedule & Start Locations (pages 2-3), and for each individual stage race, the paragraphs titled Course Lengths and Types, Course Signs Utilized, Course Feed Zones, Bonus Sprints, Time Bonuses for Stage Placing, and Start Schedule. The following paragraphs are also new compilations: Vehicles (page 9), Special Note (page 15), Start Schedule at Fort Bayard (page 16) and Start Schedule at Pinos Altos (page 16). The 2000 Course

---

[6] I have chosen to compare the 2002 Race Bible to the 1999 Race Bible because the parties agreed that there is very little difference between the 1999, 2000 and 2001 Race Bibles (other than the expected changes to dates and times made each year). Wilson's Exhibits 183, 184 and 185 provide a useful comparison of the 1999 Race Bible, 2002 Race Bible and the post-2003 Race Bibles published by Defendants. Caution must be used when consulting these Exhibits, however, for they are not entirely accurate. For example, Exhibit 183 shows that the paragraph headings "General" and "Rules" under "Support Crews & Feed Zones" are new for 2002, but the paragraphs under these headings are taken almost word-for-word from the 1999 Race Bible. (Ex. 10 at 6.) Exhibit 183 also shows that the paragraphs "Individual General Classification," "Individual Stage Placing," "Time Bonuses for Stage Finish," and "Total (Awards)" are new material added in 2002, but they are all found in the 1999 Race Bible. (Ex. 10 at 8-9.) Finally, in Exhibit 185 Wilson claims that the last page of the Race Bible contains important telephone numbers and addresses that he has copyrighted. A similar list of telephone numbers and addresses is found on page 4 of the 1999 Race Bible (Ex. 10 at 4), so Wilson cannot show that this compilation is original material that he selected and arranged.

Itineraries & Time Schedules are also compilations of data.

It is well-established that facts are not copyrightable and that no one can claim a valid copyright in facts. *Feist,* 499 U.S. at 344. However, it is also well-established that compilations of facts generally are copyrightable, and that there is "an undeniable tension between these two propositions." *Id.* at 345. Factual compilations, which involve the author's decisions about which data to include and how it should be arranged so it may be used effectively, are subject to protection when the choices are made independently by the author and "entail a minimal degree of creativity." *Id.* at 348. Although others may copy the underlying facts from the publication, if the author's selection and arrangement of the facts are original, that selection and arrangement is eligible for copyright protection. *Id.* at 349.

Both Wilson's text and factual compilations are sufficiently original that they qualify for copyright protection. For example, the 2002 Race Bible contains seven new paragraphs under the title Prize Classifications on page 4 that describe in some detail how bonuses are awarded for sprints and stage finishes and how race leader jerseys and monetary awards are determined. Wilson has a valid copyright in this written expression and the Defendants may not copy the precise words he used to present these facts. *Id.* at 348. A good example of the decisions Wilson made in selecting and arranging the data for his factual compilations is found in the Course Itineraries & Time Schedules. Wilson first chose key points along the route that racers could recognize (*i.e.*, "Top of first climb" and "Passing under train bridge at bottom of the hill"). (Ex. 1 at 1.) He then measured the distance to those locations and finally estimated the time it would take the first racer to reach those points based on historical finishing times in prior years' races. Wilson's selection and arrangement of facts in the compilations meet the minimal degree of creativity required for copyright protection. *Feist*, 499 U.S. at 348.

12

*The Graphics*

Wilson registered fourteen maps of the race courses and start locations, eight profiles of the race courses, and the page headers for each individual race as part of the graphics he created for the race. To evaluate whether Wilson's graphic materials qualify for protection, I will address each item separately.

While most courts have treated maps solely as compilations of facts, the Copyright Act categorizes them instead as "pictorial, graphic and sculptural works." 17 U.S.C. § 101; *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 142 (5th Cir. 1992). Maps are factual compilations insofar as their subject matter is concerned, presenting information about geographic relationships. *Mason*, 967 F.2d at 142 (citing David B. Wolf, *Is There Any Copyright Protection for Maps after Feist?*, 39 J. COPYRIGHT SOC'Y USA 224, 239-240 (1992)). But maps must be distinguished from non-pictorial factual compilations because they translate this subject matter into pictorial or graphic form, which is subject to copyright protection. *Id.*

While a map as a whole is copyrightable, the copyright does not protect all the individual elements in a map. Physical facts such as the names of geographic locations, landmasses, bodies of water and landmarks are not capable of copyright protection. *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 747 (2nd Cir. 1998). Additions to preexisting maps must meet the originality requirement, and simply adding color, shading, and labels that use standard fonts and shapes does not meet the minimum level of creativity for copyright protection. *Darden*, 488 F.3d at 287. Rather than examining each feature of a map individually, the court should focus on how the map maker selected, coordinated and arranged the expressive features of the map to depict its factual content. *Streetwise*, 159 F.3d at 748.

The Defendants claim that Wilson is not entitled to copyright protection in the maps because

they are based on preexisting government maps and maps drawn by other individuals for the Tour,

and that his selection, coordination and arrangement of information on the maps does not meet the

minimum level of creativity required. Both Wilson and the Defendants used preexisting government

maps as the starting points for their maps of the race courses and start/finish locations. A comparison

of the Tour's 1999 map of the Start/Finish at Fort Bayard (Ex. 10 at 18) with the map that Wilson

prepared for the 2002 Race Bible (Ex. 13 at 15) illustrates the different decisions made by the parties

concerning the factual content and pictorial depiction of the Start/Finish location at the Fort Bayard

Medical Center.

**1999 RACE BIBLE**                    **2002 RACE BIBLE**



The 1999 map is a very simple rendition of the Start/Finish at Fort Bayard. It shows that: (1)

the Tour chose a single, slightly thicker dark black line to indicate the race course on U.S. 180 and NM 152 prior to the finish at the Fort Bayard Medical Complex, (2) the Town of Santa Clara is delineated by eight streets reflected with lesser thickness than the race course and a lighter color, and (3) the map contains no details concerning the entrance road to the Fort Bayard Medical Complex. The 2002 map of the Start/Finish at Fort Bayard, by contrast, shows that: (1) the race courses on U.S. 180 and NM 152 have been redrawn and now consist of two black lines reflecting the roadway, (2) the Town of Santa Clara is shown as a shaded area south and west of U.S. 180, (3) arrows have been added reflecting the direction the racers will travel, and (4) many details concerning the entrance road to the Medical Complex have been added, including the location of various landmarks (*i.e.*, the National Guard building, a cattle guard and a gate house) that would help orient the racers to their location on the race course. Not only is Wilson's selection and arrangement of the factual information different, but the pictorial depiction of the Start/Finish location is much different, and, from a bicycle racer's standpoint, much improved in the 2002 map.

Wilson made similar decisions on the other maps he created in 2002. He had to decide how detailed each map would be. For example, the 1999 Race Bible contains a single map for the Gila Monster race. (Ex. 10 at 24.) For the 2002 Race Bible, Wilson created three separate maps to reflect the different race courses for the Gila Monster race that different categories of racers would follow. (Ex. 13 at 23-25.) In addition, Wilson had to decide what geographic features and roads to emphasize, what thickness of lines to use to delineate roads, how to indicate political boundaries, and many other details. He also had to decide how to display this information pictorially in the maps. Although the 2002 maps cover most of the same roads as the 1999 maps, the maps Wilson created for the 2002 Race Bible have a different look than the 1999 maps.

As the Fifth Circuit recognized, originality does not require "novelty, ingenuity, or aesthetic

15

merit." *Mason*, 967 F.2d at 141 (quoting H.R. Rep. No. 94-1476 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5664). Wilson's maps possess sufficient creativity in both the selection, coordination, and arrangement of the facts that they depict, and the pictorial way in which they are depicted. Thus, the maps meet the originality requirement and qualify for copyright protection.

The profiles Wilson created of each race course reflect the changes in elevation the racers will encounter as they proceed during the race. As with the maps, these profiles reflect Wilson's decisions about the scale to use and the visual depiction of the profiles that are sufficiently creative to qualify for copyright protection.

Wilson also claims copyright in the page headers that he created for the five races held in 2002. This issue may be dealt with rather summarily. The headers Wilson designed have the name of the race superimposed over the profile for that race.  For example, the header for the "Silver City - Mogollon Road Races" follows:



Wilson does not have a valid claim for copyright infringement of these headers. As noted earlier, Wilson cannot claim copyright in names, titles or short phrases, so he cannot claim copyright in the names of the races. *See* 37 C.F.R. § 202.1(a). Therefore, the headers do not qualify for copyright protection.[7]

---

[7]  Furthermore, as discussed below, the profiles used with the headers in the 2004 Race Bible and thereafter were created by Steve Farris and are not similar to the profiles that Wilson created.

### 3. Did Defendants Copy Wilson's Work?

Wilson has a valid copyright in the text and factual compilations he added to the 2002 Race Bible and related documents. His maps and profiles are also entitled to copyright protection. To establish that the Defendants infringed on his copyrights, Wilson must also demonstrate that the Defendants copied constituent elements of his original works. *Feist*, 499 U.S. at 361.

To prove that the Defendants infringed on his copyright in the textual material, Wilson must "show substantial similarity between the legally protectible elements of the original work and the allegedly infringing work." *Jacobsen*, 287 F.3d at 942-43. Whether two works are substantially similar is "a classic jury question" and the fact finder must decide "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Id.* at 943 (quoting *Nimmer on Copyright* § 13.03[A][2] and *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280, 1288 (10th Cir. 1996)).

As noted earlier, the copyright protection in a factual compilation is thin, and factual compilations are afforded the least protection under the Copyright Act. To prove that the Defendants infringed on his copyright in the factual compilations, Wilson must show "supersubstantial" similarity between his factual compilations and the factual compilations published by the Defendants. *See id.* at 944. The Ninth Circuit has held that copyright in a factual compilation protects against "only virtually identical copying." *Satava v. Lowry*, 323 F.3d 805, 812 (9th Cir. 2003).

Whether the Defendants infringed on Wilson's graphics is also determined by a substantial similarity analysis. *Streetwise*, 159 F.3d at 747. Rather than examining each map feature-by-feature, a court should focus on the overall manner in which the parties selected, coordinated and arranged

17

the expressive elements in their maps to determine whether the "total concept and overall feel created by the two works" is substantially similar. *Id.*

I will compare the text and factual compilations in the 2002 Race Bible with the 2003 Race Bible. Because Wilson granted the Defendants a license to use his graphics for the 2003 Race Bible, I will compare the maps and the profiles in the 2002 Race Bible with the maps and profiles used in the 2004 Race Bible.

There can be no doubt that the Defendants copied the new text that Wilson added to the 2002 Race Bible. Turning again to the seven paragraphs for Prize Classifications that Wilson added on page four of the 2002 Race Bible, the Defendants copied the first six paragraphs almost verbatim on pages seven and eight of the 2003 Race Bible. (Ex. 13 at 4, Ex. 14 at 7-8.) For the 2002 Race Bible Wilson added four new paragraphs under the heading Race Support. (Ex. 13 at 5-6.) While the Defendants changed the first paragraph slightly in the 2003 Race Bible, the other paragraphs are copied almost word-for-word in the 2003 Race Bible. (Ex. 14 at 4-5.) The same is true for the remaining text that Wilson added in the 2002 Race Bible.

The Defendants also copied the factual compilations that Wilson created. For example, the Races Offered, Registration Locations and Race Schedule & Start Locations found in the 2003 Race Bible are "virtually identical" to those found in the 2002 Race Bible. (Ex. 13 at 2-3, Ex. 14 at 2-3.) The same is true for the other factual compilations in the 2002 Race Bible. Further, the factual compilations found in the 2003 Course Itineraries & Time Schedules are virtually identical to the 2000 Course Itineraries & Time Schedules.

Michelle Geels and Doyne Wrealli both admitted that they copied Wilson's maps and modified them. They testified that they started with Wilson's 2002 maps and then made changes to them for the 2004 Race Bible and thereafter. They stated that they changed the maps by removing

18

their titles, removing the gray scale showing certain towns, and changing the font. They also reduced the size of some of the maps. For example, the map of the 2004 Gila Monster Race for Men Pro 1 is slightly smaller than the 2002 map. Otherwise the 2004 map is identical to the 2002 map, both in the factual material selected and in its pictorial presentation.

While the Defendants are free to make maps of the race courses, they cannot do so by starting with Wilson's maps as the templates and then editing them. *Rockford Map Publishers, Inc. v. Directory Serv. Co. of Colo., Inc.*, 768 F.2d 145, 149 (7th Cir. 1985). Although a second map maker may check his work against an original, copyrighted map, the second map maker must initially assemble the material as if there had never been the first map. *Id.* Only then may the second map maker use the first map to check for errors. *Id.* Geels and Wrealli did not independently produce their maps from original sources. Further, the total concept and overall feel of the Defendants' maps is substantially similar to the maps Wilson prepared in 2002. *Streetwise*, 159 F.3d at 748.

Wilson does not have a valid claim that the Defendants infringed on his copyrighted profiles. At trial Wilson admitted that the Defendants changed the appearance of the profiles for the 2004 Race Bible, but claimed infringement because they did so by using facts he had developed. This claim has no merit, since no one can claim a copyright in facts. *Feist*, 499 U.S. at 344. Further, Steve Farris testified that the profiles were redesigned in 2004 after he drove the courses using a GPS unit. All profiles published in the Race Bible after that time were based on the facts established by Farris. Finally, the look of the profiles is sufficiently different so that the total concept and overall feel created by the two works is not substantially similar. *Streetwise*, 159 F.3d at 748.

4. Direct and Indirect Infringement

Wilson claims that the Defendants have directly infringed on his copyrighted works by using

19

them without his permission, and that they have also indirectly infringed on his copyrights, either contributorily or vicariously. While "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," doctrines of indirect liability are well established in the law. *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 434-35 (1984). A defendant may be held liable for contributory infringement if he intentionally induces or encourages direct infringement by another, while a defendant is vicariously liable if he profits from direct infringement by another and has the right to stop or limit the infringing activity but fails to do so. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005). The Supreme Court has recognized that there may be confusion between direct and indirect liability because "the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn." *Sony Corp.*, 464 U.S. at 435 n.17 (quoting *Universal City Studios, Inc. v. Sony Corp. Of America*, 480 F. Supp. 429, 457-58 (C.D. Cal. 1979)).

Doyne Wrealli produced the Tour's race bibles from 2003 through 2006. To prepare the 2003 Race Bible she worked off the 2002 Race Bible prepared by Wilson that Brennan and Geels, as Race Directors, marked up with handwritten changes. Wrealli denied seeing Wilson's copyright notice on the 2002 Race Bible, but admitted that in 2004 Brennan and Geels told her that Wilson insisted that the Tour not make further use of his materials. In 2004 Steve Farris prepared new course profiles that he provided to Wrealli, who used them instead of Wilson's profiles in the subsequent Race Bibles. Wrealli continued to use the text and factual compilations from the 2002 Race Bible as the template for the subsequent Race Bibles. She also used Wilson's maps in the subsequent Race Bibles, but she tried to make Wilson's maps look different by making the minor changes to them I noted previously.

Rob Narvaez created the Tour's website in 2001 and has maintained it since then. He first

posted the Race Bible and other documents on the website in 2004, and has continued to do so since that time. Narvaez was not aware until 2006 or 2007 that Wilson claimed copyright protection in the materials that he created for the race.

Brennan and Geels had the right and the ability to supervise the work performed by Wrealli and Narvaez. Instead of directing Wrealli and Narvaez to stop using Wilson's materials (other than the profiles), Brennan and Geels instructed Wrealli to use Wilson's materials to produce the subsequent Race Bibles and instructed Narvaez to post them on the Internet. They provided Wilson's materials to Wrealli and Narvaez for these purposes. They also determined which materials to use and which materials to replace and dictated the edits to be made to the Race Bible each year. Moreover, it was Brennan and Geels who were in contact with Wilson and who decided to continue to use materials from the 2002 Race Bible despite Wilson's claims of copyright. Wrealli and Narvaez have directly infringed on Wilson's works by using them without his permission. The actions of Brennan and Geels also constitute direct infringement by Brennan, Geels and the Tour. Brennan, Geels and the Tour are further liable for the actions of Wrealli and Narvaez under theories of contributory infringement and vicarious liability.

### *Defenses and Counterclaims*

1. License

The Defendants do not deny that they copied and adapted Wilson's text, factual compilations and maps for use in later Race Bibles.  Instead, their main defense is that the Tour bought Wilson's intellectual property or purchased a nonexclusive license when Brennan paid Wilson for his work in preparing the 2002 Race Bible.

When a copyright owner desires to transfer any of the exclusive rights the owner has in a copyright, he must state in writing that he intends to transfer the copyright. *See* 17 U.S.C. § 204(a);

*Saxon v. Blann*, 968 F.2d 676, 680 (8th Cir. 1992). This requirement is not difficult to meet: as long as the parties' intent is demonstrated in writing, "a one-line pro forma statement will do." *Radio Television Espanola S.A. v. New World Entm't, Ltd.*, 183 F.3d 922, 927 (9th Cir. 1999) (citing *Effects Assoc., Inc. v. Cohen*, 980 F.2d 555, 557 (9th Cir. 1990)). The Defendants do not claim that Wilson's invoice or any other document satisfies this requirement, so they have failed to establish that the Tour acquired Wilson's exclusive rights to his copyrights.

A copyright owner may orally grant a nonexclusive license to use the protected material, or such license may be implied from conduct. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). A nonexclusive license does not transfer ownership of the copyright to the licensee, but permits the use of a copyrighted work in a particular way and precludes a finding of infringement. *Id.*; *see also Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir. 1998). To establish that a nonexclusive license was granted, the Defendants must prove that (1) Brennan requested that Wilson create the work, (2) Wilson created the work and delivered it to Brennan, and (3) Wilson intended that the Defendants copy and distribute his work after the 2002 race was over. *I.A.E.*, 74 F.3d. at 776.

Judge Smith previously ruled that Wilson granted the Tour an implied, nonexclusive license in the 2002 Race Bible, but he could not determine whether the license was supported by consideration and therefore irrevocable. (Doc. 113 at 9-12.) Despite this ruling, the parties extensively litigated at trial whether Wilson granted the Tour a license during his May 2002 discussion with Brennan. Since I have had the benefit of a full trial on the merits, including hearing testimony from the parties and their witnesses and reviewing more than 200 exhibits, I exercise my discretionary authority to revise the prior interlocutory ruling on this issue. *See Wagoner v. Wagoner*, 938 F.2d 1120, 1122 n.1 (10th Cir. 1991); *see also Trujillo v. Bd. of Educ. of Albuquerque Pub. Schs.*, 212 F. App'x 760, 765 (10th Cir. 2007) ("A district court has discretion to revise

22

interlocutory orders prior to entry of final judgment.").

The Defendants have failed to establish that they obtained a nonexclusive license in the 2002 Race Bible. When Wilson prepared the 2002 Race Bible, he intended that the Tour would use his work for the 2002 race and not thereafter.  Although Brennan testified at trial that he told Wilson that the Tour was purchasing Wilson's intellectual property when he paid Wilson's invoice on May 8, 2002, Wilson testified that he told Brennan that it was not for sale. Further, Brennan's testimony at trial on this issue is suspect for several reasons. First, in their Answer, the Defendants denied that Brennan attempted to purchase Wilson's intellectual property rights in May of 2002. (Doc. 63 at ¶ 7.) Second, in an affidavit Brennan filed in support of the Defendants' Motion for Summary Judgment, he failed to recount this testimony. Instead, Brennan's affidavit states that, when Wilson presented his bill, Brennan "said nothing" because he was "so mad" that he feared he "would lose control." (Doc. 95 Ex. 7 at ¶ 8.) Third, despite many contacts between the parties from 2004 to 2007 in an attempt to resolve this matter, neither Brennan nor anyone on his behalf ever claimed that Brennan purchased Wilson's intellectual property or obtained a license to use the 2002 Race Bible. (*See* Exs. 91, 130-133.) Thus, the Defendants have failed to establish that the Tour obtained a nonexclusive license to use Wilson's materials.[8]

2. Counterclaims by the Defendants

The Defendants contend that Wilson fraudulently placed his copyright notice on the 2002 Race Bible and that he misappropriated or converted the Tour's intellectual property when he

---

[8] Alternatively, assuming that Wilson granted the Tour an implied, nonexclusive license, I find that Brennan's payment of Wilson's $1,268.66 invoice was payment for use of the materials in 2002, that there was no consideration paid for its use thereafter, and that Wilson revoked the license on May 28, 2002 when he granted the Tour permission to use his graphics in 2003 without charge.

registered his works with the Copyright Office.[9] (Doc. 32 at 11.) They also claim that he made false

and misleading statements in connection with the sale of his services that violate the New Mexico

Unfair Practices Act (UPA).[10] (Doc. 32 at 12.)

To prevail upon their claims for fraud and conversion, the Defendants must prove that the

Tour owned the material at issue. In support of this argument, they claim that the fact that Wilson

placed copyright notices by the Tour on the 2000 and 2001 Race Bibles demonstrates that the Tour

owned all the intellectual property contained in those documents. There are several problems with

this argument. First, the Defendants have not disputed that Wilson created new material when he

prepared the 2002 Race Bible, or that he had permission to use the text and graphics from earlier

race bibles when he was preparing the 2000, 2001 and 2002 Race Bibles. Second, as discussed

previously, the race bibles are derivative works, and the copyright in a derivative work extends only

to the material contributed by the author of that work and does not extend to the preexisting material

employed in the work. 17 U.S.C. § 103(b); *Darden*, 488 F.3d at 286. Wilson amended his

applications to reflect that he was not claiming copyright in the materials from the earlier race

---

[9] To prevail on their claim for fraud, the Defendants must establish by clear and convincing evidence that: (1) a representation was made as a statement of fact, (2) the representation was untrue and known to be untrue by the party making it or that it was recklessly made, (3) the representation was made with intent to deceive and for the purpose of inducing the other party to act upon the representation, and (4) the other party relied on the representation and was induced thereby to act to that party's injury or damage. *Kaveny v. MDA Enters., Inc.*, 120 P.3d 854, 856 (N.M. Ct. App. 2005) (citing *Sauter v. St. Michael's Coll.*, 374 P.2d 134, 138 (N.M. 1962)). Conversion is "the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand." *Bowman v. Butler*, 648 P.2d 815, 818-19 (N.M. Ct. App. 1982) (citing *Mine Supply, Inc. v. Elayer Co.*, 411 P.2d 354, 355 (N.M. 1966)).

[10] To prove that Wilson violated the New Mexico UPA, the Defendants must prove that: (1) Wilson made a false or misleading statement, (2) the statement was knowingly made in connection with the sale, lease, rental or loan of goods or services, (3) Wilson made the statement in the regular course of trade or commerce, and (4) the statement was of the type that "may, tends to, or does, deceive or mislead any person." *Stevenson v. Louis Dreyfus Corp.*, 811 P.2d 1308, 1311 (N.M. 1991) (discussing NMSA § 57-12-2(D)).

bibles. Since Wilson is not claiming copyright protection in the underlying material, he has not misappropriated or converted the Tour's intellectual property and he did not act fraudulently by placing his copyright notice on the 2002 Race Bible and registering his works with the Copyright Office.

The Defendants also argue that Wilson acted fraudulently by acting outside the directions given to him concerning preparation of the 2002 Race Bible. They claim that Brennan only authorized Wilson to update the Bible and not to "re-do" it, and that Wilson "deliberately acted to place Tour in a position where they would have to deal with him alone if they ever wanted to conduct another race." (Doc. 126 at 6, 9.) This argument ignores undisputed facts. Brennan admitted that he never discussed with Wilson the details about what Wilson would do to prepare the 2002 Race Bible. Further, Wilson wrote to Brennan on January 25, 2002 to tell him he was "redoing the Race Bible," and there is no evidence that Brennan objected. Courts are not obligated to tolerate arguments that thoroughly defy the facts of the case or common sense. *Charczuk v. Comm'r*, 771 F.2d 471, 475 (10th Cir. 1985).

The Defendants advance several arguments for how Wilson violated the New Mexico UPA. First, they seem to claim that Wilson violated the Act by failing to inform Brennan in the May 2002 meeting concerning payment of Wilson's invoice that the Tour was not purchasing Wilson's intellectual property. (Doc. 144 at 9-10.) I have already resolved this issue against the Defendants. They also argue that Wilson failed to notify and obtain authorization from the Tour to act as an independent contractor while preparing the 2002 Race Bible and later obtaining copyright protection for his additions to it. Whether Wilson acted as an employee of the Tour, instead of acting as an independent contractor, is a mixed question of law and fact. *Reule Sun Corp. v. Valles*, 191 P.3d 1197, 1201 (N.M. Ct. App.), *cert. granted*, 195 P.3d 1267 (N.M. 2008). In many cases, including

25

construction cases, the principal test to determine whether a person is an employee is whether the employer had the right to control the details or the methods of the work to be accomplished. *See id.* at 1201-02. If a party has the right to control the details of the work, an employer-employee relationship usually exists. *Celaya v. Hall*, 85 P.3d 239, 242 (N.M. 2004).

However, New Mexico courts have recognized that the right to control test may not be the most appropriate test in determining whether a professional is an employee. *Id.* at 242-43. The New Mexico Supreme Court has adopted the approach taken in the *Restatement (Second) of Agency §* 220, which incorporates many factors in determining whether an individual is an employee or an independent contractor. *Id.* Only one of the factors suggested by the *Restatement* is the degree of control the principal exercises over the details of the work. Other factors include:

> 1) the type of occupation and whether it is usually performed without supervision; 2) the skill required for the occupation; 3) whether the employer supplies the instrumentalities or tools for the person doing the work; 4) the length of time the person is employed; 5) the method of payment, whether by time or job; 6) whether the work is part of the regular business of the employer; 7) whether the parties intended to create an employment relationship; and 8) whether the principal is engaged in business.

*Id.* at 243. None of these factors should be considered decisive, and the court should consider the totality of the circumstances in determining whether an individual is an employee or an independent contractor. *Id.*

Having reviewed New Mexico law and the facts of this case, I conclude that Wilson was acting as an independent contractor. Thus, the Defendants have failed to establish that Wilson made a false or misleading statement. Further, the Defendants assert that Wilson "cast himself, after the fact, as an independent contractor" (Doc. 144 at 10). Therefore, Wilson did not represent himself as an independent contractor until after he had performed his services, so he did not make the statement in connection with the sale of his services as required for liability under the New Mexico

UPA. *See* NMSA § 57-12-2(D).

### *Wilson's Claims for Damages, Attorney's Fees and Injunctive Relief*

Although Wilson initially sought actual damages, he later waived actual damages and instead sought statutory damages, attorney's fees and injunctive relief. (Doc. 32 at ¶¶ 29-36, Ex. 223.) Since Wilson has represented himself throughout this litigation, he has not incurred, and is not entitled to recover, attorney's fees. "Statutory damages are designed not solely to compensate the copyright owner for losses incurred, but also to deter future infringement." *Johnson*, 149 F.3d at 504 (quoting *F.W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233 (1952)). A court may award as much as $150,000 in statutory damages in cases of willful infringement. *See* 17 U.S.C. § 504(c)(2). By offering the additional choice of statutory damages to those who register promptly, Congress "intended that § 412 provide copyright owners with an incentive to register early and often." *Johnson*, 149 F.3d at 505.

Because the Race Bible and related documents were published to racers, potential racers, volunteers and course officials, to recover statutory damages Wilson must prove that he registered his works within three months of their first publication. 17 U.S.C. § 412 provides that:

> [N]o award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for . . . (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

Section 412 leaves a court "no room for discretion, mandating that no attorney's fees or statutory damages be awarded so long as the infringement commenced before the registration of the copyright." *Johnson,* 149 F.3d at 505.

Wilson asserts that the Defendants first infringed on his works in 2005, but this claim is not accurate. Wilson granted the Tour the right to use his graphics without charge for the 2003 Race

Bible, but did not grant the Tour the right to use his text or factual compilations. Thus, the Defendants first infringed on the textual materials and compilations when the Tour published the Race Bible and Course Itineraries & Time Schedules in 2003 by distributing them to the racers, race officials and volunteers. The 2003 race was held from April 30 - May 4, 2003. The Defendants first infringed on the graphics when the Tour published the 2004 Race Bible. The 2004 race was held from April 28 - May 2, 2004. In addition to being distributed to the racers, race officials and volunteers, the 2004 Race Bible was published on the Internet. The parties did not present an exact date when the materials were posted to the Internet. While I assume that the Defendants posted them many months before the start of the race, to give Wilson the benefit of the doubt I will assume that they were posted to the Internet on April 28, 2004.

Wilson could have argued that the Defendants committed a series of separate acts of infringement, and that he can recover for those acts that occurred after he registered his works in 2005. However, every court that has considered this issue has reached the same conclusion: that "infringement 'commences' for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs." *Id.* at 506. Thus, because the text and factual compilations were published in 2003 and the graphics were published in 2004, Wilson may not recover statutory damages because Defendants' infringement commenced more than three months before he registered his copyrights in April of 2005.

A court may grant temporary or final injunctive relief in a copyright case "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). A few cases hold that when copyright infringement has been proven and there is the threat of continuing infringement, the copyright holder is entitled to an injunction. *See, e.g., Walt Disney Co. v. Powell*, 897 F.2d 565, 567 (D.C. Cir. 1990). This position was recently rejected by the United

28

States Supreme Court, which held that the decision whether to grant or to deny injunctive relief is committed to the equitable discretion of the court. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (addressing request for permanent injunction in patent infringement suit by reference to Court's own copyright jurisprudence). The Court noted that it "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed." *Id.* at 392-93.

A plaintiff who seeks a permanent injunction must satisfy a four-factor test before a court may grant such relief. To obtain a permanent injunction, Wilson must prove that: (1) he has suffered an irreparable injury, (2) the remedies available at law, such as monetary damages, are not adequate to compensate for that injury, (3) considering the balance of hardships between Wilson and the Defendants, a remedy in equity is warranted, and (4) the public interest would not be disserved by a permanent injunction. *Id.* at 391. The grant of injunctive relief is an extraordinary remedy and may not be appropriate even when a party has established infringement of a valid copyright. *Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84 (2nd Cir. 2004); *Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988).

Neither Wilson nor the Defendants discussed the *eBay* factors at trial or in their written closing arguments, so my analysis is not framed or guided by their arguments on this issue. Considering the first factor, the Fourth Circuit noted that irreparable injury "often derives from the nature of copyright violations, which deprive the copyright holder of intangible exclusive rights." *Christopher Phelps & Assoc., L.L.C. v. Galloway*, 492 F.3d 532, 544 (4th Cir. 2007). The Defendants have infringed on Wilson's copyrights in the text, factual compilations and maps in the 2002 Race Bible and related documents by using them without Wilson's permission, so it appears that Wilson has satisfied this factor. Turning to the second factor, the remedies available at law are

inadequate to compensate Wilson for the injury he has sustained because statutory damages are not available. However, this factor does not weigh heavily in Wilson's favor because it was Wilson's decision to waive actual damages and his late registration of the copyrights that preclude the award of statutory damages.

The analysis of the third and fourth factors—the balance of hardships and the public interest—is informed by the types of works Wilson has copyrighted. Wilson's copyrighted text is original material that is entitled to the highest level of protection under copyright law, while his maps are derivative of preexisting work and are entitled to the next level of protection. *Warren*, 115 F.3d at 1515 n.16. While it may take both time and effort, it is possible for the Tour, Brennan and Geels to prepare race bibles that do not use Wilson's text or maps. The Tour expended significant effort in 1995 when Steve Farris rewrote the text of the Race Bible and in 2004 when he prepared new course profiles after driving the race courses with a GPS unit. As an alternative, the Tour could opt to license the use of these materials from Wilson, something that Wilson offered on more than one occasion in the past.

The public interest will best be served by a decision that allows the Tour of the Gila to continue and to flourish. The Tour is important to the cycling community, as other races nationwide have become casualties of the nation's faltering economy.[11] The Tour is, however, even more important to the Silver City and Grant County areas. Grant County's major employer, Freeport McMoRan, laid off approximately 600 employees at its Chino Mine near Silver City in February

---

[11] Existing races such as the Tour de Georgia and Tour de Leelanau were canceled for 2009, while the proposed Tour of New York, U.S. Cycling Open and Oregon Pro Cycling Classic did not materialize. Fred Dreier, *Tough Times: Recession has cycling feeling the sting*, VELO NEWS, July 2009, at 23.

of 2009.[12] Events such as the Tour of the Gila that bring bicycle racers and tourists to Grant County for an extended stay are important for the economic well being of southwest New Mexico.

Wilson's compilations of fact are entitled to the least protection under copyright law. *Id.* The compilations of fact found in the 2002 Race Bible and the 2000 Course Itineraries & Time Schedules reflect less creativity by Wilson than the text and maps he created. Considering all four of the *eBay* factors, I conclude that Wilson's protectible interest in the compilations of fact does not support the issuance of a permanent injunction. *Christopher Phelps*, 492 F.3d at 543-547 (affirming the denial of an injunction against the future lease or sale of the defendant's house, and remanding for reconsideration of the plaintiff's request for the return or destruction of the infringing architectural plans in light of the Supreme Court's intervening decision in *eBay*); *Silverstein*, 368 F.3d at 84 (determining that any protectible interest Silverstein may have in his compilations of Dorothy Parker's unpublished poems "would be so slight that it cannot properly be enforced by a preliminary or permanent injunction").

### The Defendants' Claims for Relief

The Defendants have requested a declaratory judgment establishing that Wilson does not have valid copyrights in the intellectual property of the Tour. They also request that Wilson be enjoined from claiming any rights in or interfering with the Tour, plus compensatory damages, punitive damages, costs and attorney's fees. I have already discussed all of these issues, except for the request for costs and attorney's fees. Under 17 U.S.C. § 505, a court may award costs in copyright litigation to any party other than the United States or an officer thereof, and may also award reasonable attorney's fees to the prevailing party as part of the costs. 17 U.S.C. § 505.

---

[12] *See* http://www.publicbroadcasting.net/krwg/news.newsmain/article/0/0/1430610/news/600.Layoffs.Ahead.at.Grant.County's.Chino.Mine.

Attorney's fees are not awarded automatically to the prevailing party, but rather are awarded at the discretion of the court. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994). The court should consider a number of factors when deciding whether to award attorney's fees: whether the case is frivolous or objectively unreasonable, a party's motivation, the need in particular circumstances to advance considerations of compensation and deterrence, the degree of success obtained, the purposes of the Copyright Act, and whether the chilling effect of attorney's fees may be too great or impose an inequitable burden on an impecunious plaintiff. *Id.* at 534 n.19; *Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 559-60 (9th Cir. 1996). Given the complexity of this case and the fact that both Wilson and the Defendants have prevailed in part, I decline to award attorney's fees to the Defendants. I also decline to award costs to either side.

CONCLUSION

Wilson and the other initial organizers had no understanding of copyright law as they first worked together to create the Tour of the Gila, which turned into a successful multi-stage bicycle race. Wilson worked hard and effectively for years as Race Director and in preparing and revising the Tour's Race Bible and other documents for each race. The working relationship became strained in 2000 and 2001 by discord between Wilson and Brennan and by Wilson's decision to relocate to Maryland, and was shattered by the dispute over whether Wilson should be paid for his work on the 2002 Race Bible and related documents. Since that dispute the parties' positions have hardened into enmity, which has colored their recollections of past events. Wilson testified that he created the Tour of the Gila as a for-profit enterprise and that he owns the entire bicycle race, although he admitted that he never told anyone this until trial. In contrast, Brennan and Geels testified that any intellectual property created for the Tour is, or should be, the Tour's, and that in any event, Brennan purchased Wilson's intellectual property in May of 2002.

32

The Defendants are entitled to a declaratory judgment that Wilson does not have a valid copyright in the name of the race, the design and selection of the race courses, or in the headers for the races, and that the Defendants did not infringe on Wilson's copyright in the course profiles that he prepared. Wilson has a valid copyright in the text, the factual compilations, the maps and the profiles that he prepared for the 2002 Race Bible and the 2000 Course Itineraries & Time Schedules. The Defendants have failed to establish that they obtained a license to use Wilson's works after 2003 or their counterclaims for fraud, conversion and violation of the New Mexico UPA. Because Wilson failed to register his works within three months of their first publication, he may not recover statutory damages or attorney's fees. Wilson is entitled to a permanent injunction precluding the Tour, Brennan, Geels and Narvaez from using his text and maps in the future, but he is not entitled to a permanent injunction precluding the use of his compilations of facts. I decline to award attorney's fees to the Defendants, and also decline to award costs to either side.

IT IS SO ORDERED.

_____
WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.        33